**MINNESOTA MINING AND MANUFACTURING COMPANY,**
Texas Petitioner,

v.

**NISHIKA LTD.,** LenTec Corporation, American 3D Ltd., and Nishika Manufacturing (H.K.) Ltd., Texas Respondents.

No. C2–96–2542.

Supreme Court of Minnesota.

June 12, 1997.

Rehearing Denied July 8, 1997.

Maslon Edelman Borman & Brand, LLP, David F. Herr, Michael C. McCarthy, Minneapolis, Vinson & Elkins, L.L.P., Harry M. Reasoner, Marie R. Yeates, Penelope E. Nicholson, Houston, TX, for petitioner.

Vance K. Opperman, P.A., Vance K. Opperman, Minneapolis, Susman Godfrey, L.L.P., Stephen D. Susman, Randall W. Wilson, Mary Kathryn Sammons, Houston, TX, Fulbright & Jaworski, L.L.P., James B. Sales, Houston, TX, William Powers, Jr., Austin, TX, Pamela Stanton Baron, Austin, TX, for respondents.

Smith Parker, PLLP, Matthew E. Johnson, Minneapolis, for amici curiae National Association of Manufacturers & Manufacturers Alliance.

## OPINION

KEITH, Chief Justice.

Four companies involved in the three-dimensional photography business ("respondents") sued Minnesota Mining and Manufacturing Company ("3M") in Texas state court seeking lost profits. The jury found that 3M breached express and implied warranties, and the trial court allowed the four respondents to recover one lump-sum damages award. The Texas Court of Appeals affirmed in all relevant respects, *see Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 885 S.W.2d 603, 636, 639 (Tex.Ct.App.1994) ("*3M*"), but the Texas Supreme Court withheld judgment and certified two questions of Minnesota law to this court pursuant to Minn.Stat. § 480.061 (1996):

1. For breach of warranty under [Minn. Stat. § 336.2–318], is a seller liable to a person who never acquired any goods from the seller, directly or indirectly, for pure economic damages (e.g., lost profits), unaccompanied by any injury to the person or the person's property?

2. If the answer to Question 1 is "yes," may several such persons, who may or may not be related, and who may or may not include the buyer of the goods, recover damages jointly as a single economic unit?

*3M*, 40 Tex. Sup.Ct. J. 154, No. 94–1124, 1996 WL 714345, at *5, —— S.W.2d ——, —— (Tex. Dec. 13, 1996). We answer the first certified question in the negative and the second certified question as below.

### I.

In formulating the questions certified, the Texas Supreme Court relied upon the following facts, which the court set forth in a light most favorable to the verdict.

James Bainbridge and Daniel Fingarette established a plan for managing a three-dimensional photography business through four independent companies. When 3M sold the goods at issue, Fingarette was the sole owner of the camera manufacturer (Quantronics Manufacturing (H.K.) Limited, a Hong Kong company), while Bainbridge was the sole owner of the camera marketer (American 3D Limited, a Nevada limited partnership), the printer designer (LenTec Corporation, a Georgia corporation), and the printer (Nishika Limited, a Nevada limited partnership).

In January 1988, Bainbridge met with 3M officials to seek assistance with the three-dimensional film development process. Bainbridge testified that he told 3M about his need for quality emulsion and backcoat sauce to process the film, his printer development efforts, his camera manufacturer (Quantronics), his financial commitment, and his experience in and future plans to enter the three-dimensional photography business.

In mid–1989, 3M formulated a new emulsion that 3M claimed would work well with the respondents' film development process. 3M apparently understood that this emulsion

would be used in combination with a backcoat sauce that 3M had also developed. In December 1989, 3M began selling the new emulsion to respondent LenTec. 3M also sold backcoat sauce components to respondent Nishika, which purchased 3M's new emulsion from LenTec for use in processing the photographs. The other two respondent companies—the camera marketer and manufacturer—did not purchase emulsion or backcoat sauce from 3M.

After the respondents began using 3M's new emulsion in December 1989, a problem emerged with the film development process. Specifically, the photographs faded, losing their three-dimensional effect. By early 1990, there was a significant decline in camera sales. 3M eventually solved the problem and the respondents began buying a new backcoat sauce from 3M in April 1990, but the respondents' business ultimately failed.

LenTec, Nishika, American 3D, and Nishika Manufacturing (H.K.) Limited[1] filed suit against 3M in Texas state court alleging, in part, breach of express and implied warranties. At trial the respondents argued that the photographic fading was caused by the incompatibility of 3M's new emulsion and its old backcoat sauce, which in turn undermined confidence in the respondents' business.

The jury concluded that 3M breached an express warranty for the emulsion and implied warranties for the emulsion and the backcoat sauce; that these breaches directly caused harm to each of the respondents; and that $50,000,000 would fairly and reasonably compensate the respondents as a group. Damages were reduced, however, because the jury found that the respondents were 49% at fault for failing to exercise reasonable care in evaluating and using the emulsion and backcoat sauce.

Applying Minnesota law, the Texas trial court allowed all four respondents to recover lost profits jointly and entered judgment in the amount of $29,873,599 on January 29, 1993. The Texas Court of Appeals reversed the trial court's award of pre- and post-judgment interest, but upheld the judgment in all other respects. *3M*, 885 S.W.2d at 636, 639. The Texas Supreme Court agreed that Minnesota law applied, but withheld final judgment and certified two questions of law to this court.

II.·

The first certified question asks this court to consider whether a seller may be held liable for breach of warranty to a plaintiff, who never used, purchased, or otherwise acquired goods from the seller, for lost profits unaccompanied by personal injury or property damage. Unlike the other two respondents, Nishika Manufacturing and American 3D did not deal directly with 3M nor did they use, purchase, or otherwise acquire the 3M goods at issue. In fact, Nishika Manufacturing did not exist at the time the goods were sold. Hence, Nishika Manufacturing and American 3D premise their recovery of lost profits on the statutory extension of warranty protection to certain noncontracting parties ("third-party beneficiaries").

The third-party beneficiaries provision of Minnesota's Uniform Commercial Code ("U.C.C.") addresses the reach of express and implied warranties to "injured" parties lacking privity of contract with the seller. Essentially, the provision broadens the reach of warranties by narrowing the lack of privity defense:

> A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section.

Minn.Stat. § 336.2–318. The term "person" includes corporations and other business organizations. *Id.* § 336.1–201(28), (30).[2]

---

**1.** Nishika Manufacturing displaced Quantronics as the respondents' camera manufacturer after the sales of allegedly defective goods by 3M but before this lawsuit was filed. The Respondents were also joined in their lawsuit by three individual distributors, but the jury did not award them any damages and they are not parties to this appeal.

**2.** Nine other states have adopted similar third-party beneficiaries provisions. *See* Colo.Rev. Stat. § 4-2-318 (1992); Del.Code. Ann. tit. 6,

The current version of section 336.2–318 was adopted in 1969, and is notably broader than its predecessor. *See* Act of May 23, 1969, ch. 621, § 6, 1969 Minn. Laws 1061, 1064–65. From 1965 to 1969, the section applied only to a "natural person who is in the family or household of [the] buyer or who is a guest in [the buyer's] home" and who is "injured in person" by the breach of warranty. *See* Minn.Stat. § 336.2–318 (1968). Minnesota's current version is also somewhat broader than the broadest of three options recommended by the drafters of the model U.C.C. in 1966: Alternative A is identical to Minnesota's pre–1969 version of the statute; Alternative B applies only to "natural persons" who are "injured in person"; and Alternative C is identical to current Minnesota law, but allows a seller to exclude or limit the operation of the provision if injury to the person is not involved. *See* U.C.C. § 2–318.

■ We agree with 3M that the statute is not so clear and free from ambiguity that we may disregard legislative intent, the aims of section 336.2–318 at the time of enactment, or the consequences of a particular construction. *See* Minn.Stat. § 645.16(1)–(4), (6) (1996). The unadorned term "injured" is not defined in the U.C.C., nor is it used elsewhere in the text of Article 2. As applied to Nishika Manufacturing and American 3D, the reach of section 336.2–318 is unclear. We must therefore interpret the statute consistent with legislative intent and in a sensible manner that avoids unreasonable, unjust, or absurd results. *See id.* § 645.17(1); *Thoresen v. Schmahl,* 222 Minn. 304, 311, 24 N.W.2d 273, 277 (1946).

Under section 336.2–318, this court has sanctioned the recovery of lost profits (one form of economic loss) by a third-party beneficiary whose damages arose from a remote seller's breach of warranty. *See Hydra–Mac, Inc. v. Onan Corp.,* 450 N.W.2d 913, 916 (Minn.1990) (allowing the plaintiff—a marketer of skid loaders and subpurchaser of defective engines—to recover for lost profits and unreimbursed repair and retrofit expenses, and noting that the district court properly applied section 336.2–318); *see also Transport Corp. of Am. v. International Business Machines Corp.,* 30 F.3d 953, 956, 959 (8th Cir.1994). We have also indicated that plaintiffs who never used, purchased, or otherwise acquired defective goods may qualify as third-party beneficiaries when they suffer property damage. *See Lloyd F. Smith Co., Inc. v. Den–Tal–Ez, Inc.,* 491 N.W.2d 11, 13–14, 16 (Minn.1992); *see also Nacci v. Volkswagen of Am., Inc.,* 325 A.2d 617, 619–20 (Del.Super.Ct.1974) (applying Delaware's version of the statute to a personal injury claim).[3]

But this court has never gone so far as to hold that section 336.2–318 reaches a plaintiff who is seeking lost profits unaccompanied by physical injury or property damage *and* who never used, purchased, or otherwise acquired the goods in question. To do so, we believe, would expand warranty liability well beyond the limits contemplated by the legislature.

■ When placed in historical context, it seems clear that the primary motivation for the current version of section 336.2–318 was concern for injured consumers. A prevalent legal conflict at the time of enactment was how best to protect consumers from dangerous products. One route was to expand the doctrine of "warranty" to reach subpurchasers and others injured in person by defective products. During the 1960s, however, the preferred course was to recognize that the concept of "warranty" had been outgrown and to legitimize recovery in tort. *See* Wil-

§ 2–318 (1993) (limiting its reach to natural persons); Haw.Rev.Stat. § 490:2–318 (1993); Iowa Code Ann. § 554.2318 (West 1995); N.D. Cent. Code § 41–02–35 (1983); R.I. Gen. Laws § 6A–2–318 (1992); S.D. Codified Laws § 57A–2–318 (Michie 1988); Utah Code Ann. § 70A–2–318 (Michie 1996); Wyo. Stat. Ann. § 34.1–2–318 (Michie 1991). Three other states use similar language, but they refer to and allow suits for "damages," rather than suits by "injured" parties. *See* Ark.Code Ann. § 4–86–101 (Michie

1987); N.H.Rev.Stat. Ann. § 382–A:2–318 (1994); Va.Code Ann. § 8.2–318 (Michie 1991); *see also* Me.Rev.Stat. Ann. tit. 11, § 2–318 (West 1995) (applying to "any action" against certain specified defendants); Mass. Ann. Laws ch. 106, § 2–318 (Law.Co-op.1984) (same).

**3.** 3M does not argue that *Hydra–Mac* should be overruled, nor does it dispute that physical injury or property damage is recoverable by those "outside the distributive chain" of a seller's goods.

liam L. Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L.Rev. 791, *passim* (1966) (recounting the legal battle to break down the barrier of "privity," which culminated in widespread adoption of strict products liability in tort). Despite the promulgation of *Restatement of Torts (Second)* § 402A in 1965—which we adopted in 1967, *see McCormack v. Hankscraft Co.*, 278 Minn. 322, 337–40, 154 N.W.2d 488, 499–501 (1967); *see also Milbank Mut. Ins. Co. v. Proksch,* 309 Minn. 106, 115 n. 4, 244 N.W.2d 105, 110 n. 4 (1976)—the drafters of the model U.C.C. presented states with Alternative C of the third-party beneficiaries provision, which was intended to follow the trend of strict products liability and extend warranty protection "beyond injuries to the person." U.C.C. § 2–318 cmt. 3. But the expansion of warranty protection to certain classes of noncontracting parties in the U.C.C. cannot be completely detached from the concerns that motivated our legislature in 1969. *See* Minn.Stat. § 645.16(1)–(4).

▆▆▆▆ Our understanding of the background and aims of section 336.2–318 leads us to conclude that the scope of a seller's liability for breach of warranty should recede as the relationship between a "beneficiary" of the warranty and the seller's goods becomes more remote. Consistent with *Hydra–Mac*—and assuming that section 336.2–318 is otherwise satisfied—those who purchase, use, or otherwise acquire warranted goods have standing to sue for purely economic losses. Those who lack any such connection to the warranted goods must demonstrate physical injury or property damage before economic losses are recoverable. This line comports with legislative intent, provides a clear rule of law, and identifies a sensible limit to liability without disrupting settled precedent.

Any other result implies almost unlimited liability for sellers of warranted goods. If section 336.2–318 were interpreted as the respondents advocate, it seems that the re-spondents' individual employees, or perhaps even their families, would have standing to sue 3M for causing the loss of their jobs or even a decline in their wages. The respondents' reading also appears to allow recovery on the facts of *Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.*, 345 N.W.2d 124 (Iowa 1984), in which plaintiffs connected with motel, restaurant, bar, and retail businesses invoked Iowa's third-party beneficiaries provision in an attempt to sue solely for economic losses arising from a bridge closing; the closing was allegedly caused by the defendant-seller's defective steel. *Id.* at 125. That attempt to expand the scope of the U.C.C. was rejected. *Id.* at 129. The respondents appear to advocate warranty recovery as a catch-all alternative for plaintiffs with no viable legal basis for suit. The risk, however, is that the fortuitous existence of a warranty—between some seller and some buyer, somewhere—would allow remote yet foreseeable parties to recover for their hampered expectations, while others in similar circumstances—but who could not identify a warranty—would not. *Cf. Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 885 (Iowa 1983) ("Plaintiff is not an injured consumer; he was a shareholder of a corporation whose expectations did not materialize. To allow a shareholder to use products liability law as the vehicle to a direct cause of action otherwise denied by general corporate law would be an injustice to both areas of the law.").

Confronted with liability of this magnitude, sellers would be encouraged to attempt to disclaim warranties or exclude consequential damages remedies—affecting both the immediate buyer and third-party beneficiaries alike. *See* Minn.Stat. § 336.2–318 (prohibiting a seller from limiting the reach of the third-party beneficiaries provision); *Hydra–Mac*, 450 N.W.2d at 916 (noting, however, that a valid warranty disclaimer under Minn. Stat. § 336.2–316 made to an original purchaser extends to third-party beneficiaries); *see also* U.C.C. § 2–715 cmt. 3.[4]

---

**4.** The respondents argue that their interpretation of section 336.2–318 is tempered by section 336.2–715(2)(a), which includes as consequential damages "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know." Assuming that section 336.2–715(2)(a) applies to third-party beneficiary cases, *see Hydra–Mac*, 450 N.W.2d at 920; *Industrial Graphics, Inc. v. Asahi Corp.*, 485 F.Supp. 793, 807 (D.Minn.1980), it is not the rigid, subjective, and antiquated test that the respondents put forth.

■ We therefore reject the respondents' reading of the statute—an interpretation that would likely lead to a variety of unreasonable, unjust, and absurd results that we cannot imagine were intended by the legislature. *See* Minn.Stat. §§ 645.16(6), 645.17(1); *Thoresen,* 222 Minn. at 311, 24 N.W.2d at 277. In light of the statute's language and purpose, and consistent with the legislature's apparent intent, the best reading of section 336.2–318 is that noncontracting parties who never used, purchased, or otherwise acquired the seller's warranted goods may not seek lost profits, unaccompanied by physical injury or property damage, for breach of warranty under the statute. Nishika Manufacturing and American 3D are simply not within the class of warranty "beneficiaries" protected by section 336.2–318. The first certified question must be answered in the negative.

### III.

Because our answer to the first certified question necessitates judicial alteration of the respondents' damages award or a new trial—matters to be addressed by the Texas courts—it is both helpful and proper to reach the merits of the second certified question.

■ The jury found that 3M's breach of express and implied warranties was a direct cause of harm to each of the four respondents and that $50,000,000 was a reasonably certain sum that would fairly compensate them *collectively.* But the special verdict form did not ask for the amount of damages that each respondent had proved *individually.* The second certified question asks whether the respondents may "recover damages jointly as a single economic unit."

■ This issue is a product of modern liberal joinder rules adopted by many states. In Minnesota,

All persons may join in one action as plaintiffs if they assert any right to relief, jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of fact or law common to all these persons will arise in the action.

Minn. R. Civ. P. 20.01; *see also* Tex.R. Civ. P. 40(a). Such rules allow certain plaintiffs to seek relief in a single action, whether their right to relief is "joint" or not. But such rules were not intended to alter the substantive proof burdens of plaintiffs seeking damages. *See* 2 Douglas D. McFarland & William J. Keppel, *Minnesota Civil Practice* § 1411, at 219 (2d ed.1990).

The respondents argue that they "alleged and proved joint claims." There is certainly some authority for the proposition that a defendant has no reason to complain about a joint damages award when the cause of action or claim is itself joint in nature. *E.g., Silver Unicorn, Inc. v. Matheson,* 638 So.2d 985, 986 (Fla.Dist.Ct.App.1994); *Ortiz v. Avante Villa at Corpus Christi, Inc.,* 926 S.W.2d 608, 612 (Tex.Ct.App.1996); *Lewis v. Hall,* 271 S.W.2d 447, 451 (Tex.Ct.App.1954); 49 C.J.S. *Judgments* § 33, at 87 & nn. 97–98 (1997). However, the respondents fail to identify any Minnesota precedent for characterizing their claims as "joint." In fact, the sole foundation for their argument is that their claims "were based on the same conduct by 3M that created the warranties, and the same conduct by 3M that breached them." Although this court has not had recent occasion to address the issue of when a legal claim posed by multiple parties is "joint," the respondents' argument is clearly inconsistent with traditional notions of joint claims or joint causes of action.[5] The four

---

*See Hydra–Mac,* 450 N.W.2d at 920; *Bemidji Sales Barn, Inc. v. Chatfield,* 312 Minn. 11, 15–16, 250 N.W.2d 185, 188 (1977); *Despatch Oven Co. v. Rauenhorst,* 229 Minn. 436, 445, 40 N.W.2d 73, 79 (1949); *see also* Minn.Stat. Ann. § 336.2–715 Minn.Code cmt. (explaining that the statute follows the rule in cases such as *Despatch Oven* ); U.C.C. § 2–715 cmt. 2; 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 10–4, at 569–70 (4th ed.1995).

5. *King v. Socony–Vacuum Oil Co.,* 207 Minn. 573, 574–76, 292 N.W. 198, 199 (1940); *Thorn v. Geo. A. Hormel & Co.,* 206 Minn. 589, 594, 289 N.W. 516, 518 (1940); *Nahate v. Hanson,* 106 Minn. 365, 367, 119 N.W. 55, 55 (1908); *Ermentrout v. American Fire Ins. Co.,* 60 Minn. 418, 420, 62 N.W. 543, 544 (1895); *Cochrane v. Quackenbush,* 29 Minn. 376, 378, 13 N.W. 154, 155–56 (1882). Of course, the regime of civil procedure was quite different when these cases were decided and the primary issue was "mis-

respondents do not have a joint legal interest in the judgment that was entered, and each of the respondents is a legally independent entity.

 The respondents also assert that no harm is done to a defendant if multiple plaintiffs with separate claims decide to ask for a joint damages award, as long as each plaintiff individually satisfies the other elements of their claims. The respondents concede that plaintiffs in breach of warranty cases must prove that there was a warranty, that it was breached, and that a loss was caused by the breach. *E.g., Peterson v. Bendix Home Sys., Inc.,* 318 N.W.2d 50, 52–53 (Minn.1982). They also recognize that a plaintiff suing for breach of warranty must prove the amount of any lost profits to a reasonable degree of certainty. *E.g., Hydra–Mac,* 450 N.W.2d at 920; *Polaris Indus. v. Plastics, Inc.,* 299 N.W.2d 414, 419 (Minn. 1980); *Cardinal Consulting Co. v. Circo Resorts, Inc.,* 297 N.W.2d 260, 267 (Minn.1980); *Faust v. Parrott,* 270 N.W.2d 117, 120 (Minn. 1978). The respondents, however, believe that this burden can be carried by them as a group.

We disagree. In general, and absent a joint claim, each plaintiff has an obligation to prove the amount of damages that it individually suffered. *See* 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10.02 (3d ed.1992) (stating that proof of aggregate damages as a common issue is unique to class actions, and that, in traditional individual suits, a defendant's liability to joined plaintiffs is the total of the damages "as proved for each of the joined plaintiffs"). The lump-sum judgment in this case deprived 3M of a jury determination of the sufficiency of the evidence with respect to each individual respondent. As legally independent entities with factually distinct

connections to 3M's alleged breach, the individual respondents' evidence might vary in strength. A joint recovery risks eliminating the legal significance of these differences.[6] There may be exceptional cases in which lump-sum damages are appropriate and fair. But on the facts of this case, the respondents were not entitled to a joint recovery of damages for lost profits.

First certified question answered in the negative, second certified question answered as above.

PAGE, J., took no part in the consideration or decision of this case.

---

joinder" of parties and claims. Nevertheless, the cited cases are some indication of the extent of the "joint claims" concept. Whatever their persuasive authority, we see nothing in our case law to support the respondents' contentions.

**6.** Cases from other jurisdictions that have faced the issue of joint recovery also cut against the respondents' position. *See Home Ins. Co. v. Pugh,* 51 Ala.App. 373, 376, 286 So.2d 49, 51 (Ala.Civ.

App.1973); *Nemer v. Anderson,* 151 Colo. 411, 417–18, 378 P.2d 841, 845 (Colo.1963); *Silver Unicorn,* 638 So.2d at 986; *Caton v. Flig,* 343 Ill.App. 99, 98 N.E.2d 162, 163 (1951); *Tramonte v. Palermo,* 640 So.2d 661, 666 (La.Ct.App.1994); *Slusher v. Jack Roach Cadillac, Inc.,* 719 S.W.2d 880, 883 (Mo.Ct.App.1986); *Musto v. Mitchell,* 105 N.J.L. 575, 576–77, 146 A. 212, 213 (1929); *Mullen v. Roberts,* 423 S.W.2d 576, 578–79 (Tex. 1968).